Kenneth **MORGAN** et al., Plaintiffs,

v.

Douglas **SPROAT** et al., Defendants.

Civ. A. No. J75–21(N).

United States District Court, S. D. Mississippi, Jackson Division.

April 18, 1977.

Barry H. Powell, Charles H. Ramberg, Jackson, Miss., for plaintiffs.

P. Roger Googe, Jr., Sp. Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

This case challenges the conditions of confinement at the Oakley Training School (hereafter OTS), a state institution for delinquent boys, located near Raymond, Mississippi. The case arises under 42 U.S.C. § 1983 and the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. § 1343.

At the time of the filing of his complaint, the named plaintiff, Kenneth Morgan, was 16 years old and was confined under an order of the Chancery Court of Rankin County, Mississippi finding him to be delinquent. On April 1, 1975, the Court certified the case as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. The class consists of all present and future students confined at OTS, which at the time of filing consisted of approximately 350 boys between the age of 15 and 20. Defendants, who are sued in their individual and official capacities, are the Superintendent and two Assistant Superintendents of OTS, the Director of the Mississippi Department of Youth Services, and the five members of the Board of Trustees of the Department of Youth Services.

This cause was submitted for decision on the basis of an agreed record consisting of the depositions of a number of expert witnesses,[1] the pretrial order and numerous

---

1. The expert witnesses appointed by the Court were Daniel Cox, Ph.D., a clinical psychologist licensed by the State of Mississippi who specializes in the treatment of adolescents with behavior problems; Douglas O. Draper, Ph.D., a clinical psychologist licensed by the State of Mississippi who is a specialist in the use of behavior modification techniques; and C. Paul Phelps, Jr., the Deputy Director of the Louisiana Department of Corrections. The expert

other depositions and exhibits introduced by the parties.[2]

On November 22, 1975, the Court entered an agreed Order relating to plaintiffs' claims that the discipline procedures at OTS violate the due process clause of the Fourteenth Amendment. Under the Order, defendants agreed to provide procedural safeguards, including prior notice and an impartial evidentiary hearing, to all OTS students who are accused of violating the school's rules and regulations. Defendants have also promulgated a new code of rules governing student conduct, approved by the plaintiffs, and adopted by Order of this Court on November 26, 1976. The effect of these Orders is to remove from consideration at this time plaintiffs' claims involving the constitutionality of the rules and regulations which govern student conduct at OTS.

Before reaching the specific claims made by plaintiffs, we will describe the Mississippi juvenile justice system under which plaintiff and the members of his class have been committed to OTS, and will discuss the two principal legal theories under which plaintiffs attack the conditions at OTS.

## I. THE MISSISSIPPI JUVENILE JUSTICE SYSTEM.

Under the Mississippi Youth Court Act, Miss.Code Ann. §§ 43–21–1, *et seq.*,[3] any child between ten and eighteen years of age may be adjudicated a delinquent upon the petition of "a reputable person." § 43–21–11. A delinquent child is defined as any child "whose occupation, behavior, environment or associations are injurious to his welfare or the welfare of other children," and includes children who have run away from home, who are "habitually disobedient to or beyond the control" of their parents, who violate school rules or are willfully truant, or who deport themselves so as to injure or endanger the morals or health of themselves or any other person. § 43–21–5. The conduct for which juveniles may be incarcerated need not constitute a violation of any of the state's criminal laws.

After a delinquency petition is filed, a hearing is held before the Youth Court. The hearing is not a criminal proceeding but is "of a civil nature concerned with the care, protection, and rehabilitation of the child in question. . . ." § 43–21–17. The rules of evidence are not applicable,

---

witnesses called by plaintiffs were Michael A. Milan, Ph.D., an Assistant Professor of Psychology at the Georgia State University, a member of the American Association of Correctional Psychologists and the American Association for the Advancement of Behavior Therapy; William R. Fannin, Jr., M.D., a licensed child psychiatrist who presently serves as the Director of Clinical Services at the Keritas Community, a residential treatment center for delinquents and other children with emotional and behavior problems located in Crystal Springs, Mississippi; Charles R. Bell, III, Ph.D., a licensed educational psychologist who is also certified by the Mississippi State Department of Education as a public school administrator and a teacher of learning disabled children; Jack Lamar Daniels, Ph.D., a Professor of Counseling and Guidance and the Director of the Career Development Center at the University of Southern Mississippi; and Stanley L. Brodsky, Ph.D., a Professor of Psychology at the University of Alabama and the Editor of the Journal of Criminal Justice and Behavior and an Associate Director of the Center for Correctional Psychology at the University of Alabama. The expert witnesses called by defendants were Jack K. Reed, the Superintendent of the Mississippi State Penitentiary at Parchman;

and Grady A. DeCell, the Director of the South Carolina Department of Youth Services.

2. All of the depositions are cited by the last name of the witness and the transcript page as follows: "Davis . . . ." There are two depositions of Superintendent Sproat. The deposition taken at the instance of plaintiffs on July 17, 1975 is cited as "Sproat I . . . ." and the deposition taken at the instance of defendants on December 12, 1975 is cited as "Sproat II . . . ." The stipulations of fact contained in part 4 of the Pretrial Order are cited by paragraph and page as follows: "Pretrial Order ¶ A(1) at 4." The Exhibits to the Pretrial Order are cited as "Pretrial Order Exh. . . . ." The additional Exhibits introduced by the parties as part of the agreed record are cited by the exhibit number as follows: "Exh. . . . ."

3. In one of Mississippi's 82 counties, there is a Family Court instead of a Youth Court. Miss. Code Ann. §§ 43–23–1, *et seq.* (1972). In all respects relevant to this case, the operation of the Family Court Act is the same as the Youth Court Act.

except as required by "applicable constitutional standards." *Id.* The juvenile is not entitled to a jury, and the hearing is not open to the public. *Id.* Finally, in addition to the juvenile and his or her parent or guardian, any other person who is interested in the case may appear and be represented by counsel. *Id.*

After the hearing, the Youth Court may enter an order adjudicating the juvenile a delinquent child. The order may not recite any of the facts or circumstances upon which the adjudication is based, and it may not recite that the child has been found guilty of any offense. § 43–21–19. The adjudication does not impose the civil disabilities ordinarily imposed for criminal convictions, and the child may not be deemed a criminal by reason of the adjudication. *Id.*

Any child between the ages of 10 and 18 who is adjudicated a delinquent may be committed by the Youth Court to the custody of a state-supported training school, which may retain custody of the child until he or she reaches the age of 20. However, the superintendent of the training school may parole the child "at any time he may deem it to be to the best interest and welfare" of the child. § 43–21–19.

Just as Youth Court hearings are not criminal, the purposes of juvenile incarceration under Mississippi law are therapeutic, not punitive. Thus, the State Department of Youth Services, which operates the state's training schools, is authorized

> to develop and implement diversified programs and facilities to promote, enhance, provide and assure the opportunities for the successful care and treatment of delinquent children . . .

§ 43–27–10(d); and the training schools are to be operated so as

> to properly diagnose, care for, train, educate and rehabilitate children and youth . . . , being careful to employ no

discipline, training or utilization of time and efforts of such youth that shall under any condition or in any way interfere with such [rehabilitation and reformation] objectives.

§ 43–27–22(b)(1) and (2).[4]

## II. THE JUVENILE'S RIGHT TO TREATMENT AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

█ In addition to their rights under Mississippi law, juveniles who are involuntarily committed to the Oakley Training School have a constitutional right to individualized care and treatment to enable them to become productive members of society. This right is supported by two equally sound theories.

█ First, where, as in Mississippi, the purpose of incarcerating juveniles in a state training school is treatment and rehabilitation, due process requires that the conditions and programs at the school must be reasonably related to that purpose. The Supreme Court made this clear in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), where the Court held that a mental retardate committed to a state mental institution as incompetent to stand trial could not be confined indefinitely without treatment for his condition:

> At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.

406 U.S. at 738, 92 S.Ct. at 1858. More recently, in *Morales v. Turman*, 383 F.Supp. 53 (E.D.Tex.1974), *rev'd on other grounds*, 535 F.2d 864 (5th Cir. 1976),[5] a case involving the incarceration of juvenile delinquents, the court stated:

> This basis for commitment—to rehabilitate and re-establish the juvenile in society—is clearly grounded in a *parens patriae* rationale. Thus, under the *parens pat-*

---

4. *See also Montgomery v. Oakley Training School*, 426 F.2d 269, 270–1 (5th Cir. 1970) (testimony of Training School Superintendent regarding interruption of rehabilitation by transfer of students between schools).

5. *Morales* was reversed and remanded for the "proper empanelling of a three-judge court." 535 F.2d at 873. For reasons to be set forth in greater detail *infra*, we find no requirement for a three-judge court in the instant case.

*riae* theory, the juvenile must be given treatment lest the involuntary commitment amount to an arbitrary exercise of governmental power proscribed by the due process clause.

383 F.Supp. at 71. Similarly, in *Martarella v. Kelley,* 349 F.Supp. 575 (S.D.N.Y.1972), the court stated, "Where the State, as parens patriae, imposes such detention, it can meet the Constitution's requirement of due process and prohibition of cruel and unusual punishment if, and only if, it furnishes adequate treatment to the detainee." 349 F.Supp. at 585. *See also Wyatt v. Aderholt,* 503 F.2d 1305, 1312–1313 (5th Cir. 1974); *Pena v. New York State Division for Youth,* 419 F.Supp. 203 (S.D.N.Y.1976); *Welsch v. Likins,* 373 F.Supp. 487, 496–497 (D.Minn. 1974).

■ Second, the State of Mississippi incarcerates juveniles without affording the full panoply of due process safeguards for delinquency adjudication hearings as are provided for adult criminal offenders. Miss.Code Ann. §§ 43–21–5, –17, –19. This denial of due process safeguards would be constitutionally impermissible unless the incarceration of juveniles serves beneficent, rather than punitive, purposes. *See McKeiver v. Pennsylvania,* 403 U.S. 528, 547, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

For these reasons, the courts have held that due process requires that the incarceration of juveniles be for rehabilitation and treatment. For example, in *Nelson v. Heyne,* 355 F.Supp. 451 (N.D.Ind.1972), *aff'd,* 491 F.2d 352 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), the court reviewed the decisions of the Supreme Court which have delineated the procedural rights of juvenile offenders and concluded:

The procedural rights now accorded a juvenile are patterned in large part by their impact upon the *parens patriae* underpinning of the juvenile justice system. The Court has sought to balance the juvenile's procedural rights against the dictates of regenerative treatment, and where the asserted procedural right impinges upon the basic and unique premises of the juvenile system, the right is denied. In effect, the juvenile offender is not fully protected by all of those rights secured to an adult, and the measure of the juvenile's protection is in large part determined by treatment interests.

355 F.Supp. at 459 (citation omitted). And in *Morales, supra,* the court similarly stated:

The three central limitations on the government's power to detain are: (1) that detention be retribution for a specific offense; (2) that it be limited to a fixed term; and (3) that it be permitted only after a proceeding where fundamental procedural safeguards are observed. In their absence, a *quid pro quo* must be extended by the government to justify confinement. As previously noted, the *quid pro quo* applicable here, by virtue of state statute, is rehabilitative treatment.

383 F.Supp. at 71. *Accord, Inmates of Boys' Training School v. Affleck,* 346 F.Supp. 1354, 1364 (D.R.I.1972) (". . . the constitutional validity of present procedural safeguards in juvenile adjudications, which do not embrace all of the rigorous safeguards of criminal court adjudications, appears to rest on the adherence of the juvenile justice system to rehabilitative rather than penal goals.").

■ Juveniles incarcerated in state training schools are also protected by the Eighth Amendment's prohibition against cruel and unusual punishment. *Martarella v. Kelley, supra* at 585. The Eighth Amendment is binding on the states through the Fourteenth Amendment, *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), and it protects individuals who are not considered to have been convicted of any crime, such as juveniles committed to state training schools. *Nelson v. Heyne, supra,* 491 F.2d at 356; *Lollis v. New York State Department of Social Services,* 322 F.Supp. 473 (S.D.N.Y. 1970). Furthermore, the prohibition against cruel and unusual punishment "is not limited to specific acts directed at selected individuals, but is equally pertinent to general conditions of confinement,"

**1137**

*Gates v. Collier,* 501 F.2d 1291, 1301 (5th Cir. 1974), such as many of the conditions challenged by plaintiffs here. *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977).

## III. THREE–JUDGE COURT.

 Although no party has raised the question of the necessity under 28 U.S.C. § 2281 of convening a three-judge court in this case, this issue is jurisdictional, and it is incumbent on the Court to do so *sua sponte. Morales v. Turman, supra,* 535 F.2d at 873 n. 11;[5a] *Sands v. Wainwright,* 491 F.2d 417, 424 (5th Cir. 1973), *cert. denied, Guajardo v. Estelle,* 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771 (1974). We do not deem it necessary, however, to set forth in detail the legal principles which govern a determination of the applicability of § 2281 to cases attacking on constitutional grounds conditions of confinement in state rehabilitative institutions, inasmuch as these principles have been enunciated repeatedly and in great detail by the Fifth Circuit Court of Appeals in recent years. *E. g., Costello v. Wainwright,* 539 F.2d 547 (5th Cir. 1976) (en banc); *Morales v. Turman, supra,* 535 F.2d 864 (5th Cir. 1976); *Newman v. State of Alabama,* 503 F.2d 1320 (5th Cir. 1974); *Sands v. Wainwright, supra* (en banc). Upon careful consideration of these and other relevant authorities, we conclude that § 2281 does not require the convening of a three-judge court in the instant case because the plaintiffs here do not seek to enjoin an officer of the state from acting pursuant to a state statute of statewide applicability.

In many respects the case most closely resembling the instant one is *Morales v. Turman, supra,* which was remanded by the Court of Appeals to the District Court for the convening of a three-judge court. Like the instant case, *Morales* involved a comprehensive, broad-based, constitutional attack on the conditions of confinement at rehabilitative institutions for juveniles.

Critically, however, the *Morales* attack was aimed at policies and practices of the Texas Youth Council, applying to all juvenile institutions in the state. By contrast, the plaintiffs in the instant case attack only the policies and conditions of Oakley Training School, one of a number of institutions and programs administered by the Mississippi Department of Youth Services. The rehabilitative policies attacked are found only locally at Oakley and are promulgated by the superintendent of that institution, not by the Director of the Department of Youth Services. Thus, the policies and procedures complained of are not state statutes of statewide applicability. *See, Wolff v. McDonnell,* 418 U.S. 539, 542 n. 1, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. New Left Education Project,* 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972); *Morales v. Turman, supra,* 535 F.2d at 872–73 nn. 10–11; *Newman v. State of Alabama, supra* at 1327.

Further, none of the relief sought or ordered here exceeds the compliance authority of the defendants under Mississippi statutes. *Cf, Costello v. Wainwright, supra* at 550. Likewise, the plaintiffs' demands and this Court's decision are carefully circumscribed to assure that nothing contained therein will require reallocation of legislative appropriations, a result which would bring this action within the purview of § 2281. *Wyatt v. Aderholt, supra* at 1318 (5th Cir. 1974). In those instances where it appears that significant reallocation of funds may be necessary to comply with constitutional mandates, the Court has refrained from ordering immediate action in order to allow the defendants to report to the Court on the action taken by the Mississippi Legislature on their pending requests for such funds. *See also, Williams v. Edwards, supra.*

 Finally, the Court notes that the defendants' failure to move for the conven-

---

**5a.** Subsequent to the ˏ reparation of this Memorandum Opinion in final form, the United States Supreme Court reversed per curiam the Fifth Circuit's finding in both *Morales* and *Costello v. Wainwright, infra,* that a three-judge

court was required in those cases. —— U.S. ——, ——, 97 S.Ct. 1189, 1191, 51 L.Ed.2d 368, 372 (1977). The instant decision is entirely consistent with the Supreme Court's rulings therein.

ing of a three-judge court indicates that the state does not view these issues as necessitating one. While the state's view is not conclusive on this question, it is "entitled to great weight." *Morales v. Turman, supra,* 535 F.2d at 873 n. 11. *See also, Sands v. Wainwright, supra* at 424.

## IV. INTENSIVE TREATMENT UNIT.

■ The Intensive Treatment Unit (ITU) was constructed in 1972 as a security facility for OTS students with discipline problems. Pretrial Order ¶ E(2) at 7, ¶ H at 24. The ITU consists of fifteen individual cells, a day room,[6] a shower room and an office for the cottage parent who is on duty. Pretrial Order ¶ H(3) at 24. The walls and floors are covered with a tile or terrazzo-like material. *See also,* Exs. P–1 to P–5.

One of the cells was padded until recently. It has no window, furnishings, or slab for sleeping. The toilet consists of a hole in the floor with a flushing mechanism located outside of the cell. Pretrial Order ¶ H(4) at 24; Ex. P–3. This cell is regularly used to house students during the day when all of the other cells are in use. Pretrial Order ¶ H(4) at 24; Brodsky 10.

The other fourteen cells have no furnishings, except a combination wash basin/commode and a concrete slab built into the wall for sleeping.[7] Each of these cells has a small opaque outside window, which admits some light but does not allow the occupant to see outside. The cell doors are solid except for a T-shaped opening. Pretrial Order ¶ H(5) at 26. Although there are spaces for light fixtures in each of the cells, the fixtures have been removed. Reed 8–9; Brodsky 9.

Students in the ITU are confined alone in their cells for the entire day, except for twice-daily showers and a group calisthenics period on weekdays. Pretrial Order ¶ H(7), (15) and (19) at 26 and 28. Meals are eaten in the cells. Davis 92. Students are not permitted to talk to other students. Pretrial Order ¶ H(11) at 27; Davis 97. Students are not permitted to lie down or to sleep during the day. Pretrial Order ¶ H(11) at 27; Davis 97.

Students who are confined in the ITU are denied all of the programs and services which are given to students in the general OTS population. They do not attend academic or vocational classes, nor do they receive any substitute instruction. Pretrial Order ¶ H(16) at 28. They are denied reading materials, except the Bible. Pretrial Order ¶ H(17) at 28. Prior to the filing of this suit, they were not permitted to write or receive letters.[8] Pretrial Order ¶ H(18) at 28.

During 1974, students were confined in the ITU on 393 separate occasions. The most frequent offense resulting in confinement was running or threatening to run away. Students were also confined for being disrespectful to staff members, stealing, "behaving inadequately," fighting, homosexual behavior, and for attempted suicide. Pretrial Order ¶ H(1–2) at 24–25. The record shows that the average length of confinement in the ITU is 11 days, but students have been confined for as long as 85 days. Pretrial Order ¶ H(2) at 25.

As stated in the original funding application to the Law Enforcement Administration for the construction of the ITU, its purpose is to provide intensive counseling and treatment to enable students to adjust to institutional life. Milan 74. However, the experts agreed that no real treatment or counseling services are therein provided

---

**6.** The day room is approximately 16 feet by 26 feet. Except for some double beds, there is no furniture or recreational equipment in the day room. Pretrial Order ¶ H(6) at 26. The day room is used as a living-sleeping area for some students just prior to their release from the ITU. Davis 79–80.

**7.** Prior to the filing of this suit, mattresses were provided at night, but removed during the day.

It was stipulated that since September 1975 the mattresses have been left in the cells, Pretrial Order ¶ H(5) at 24; but one of the witnesses found during his inspection that the mattresses had been removed. Brodsky 11.

**8.** In September, 1975, this restriction was lifted. Pretrial Order ¶ H(18) at 28.

to the students. Milan 74–75; Brodsky 10; DeCell 30–31; Draper 30–31. Students have no contact with their own cottage parents or teachers, and there is no counseling program for them. Pretrial Order ¶ H(15), (16) at 27–28. Instead, on the days he is on duty, the chief counselor visits each ITU student for up to ten minutes. Pretrial Order ¶ H(14) at 27. The ITU staff often do not know why the students have been confined, Brodsky 8, 10, 81–82, 98; and the students' charts do not reflect the reasons for their confinement. Pretrial Order Exh. J.

Both the Court's and plaintiffs' experts testified that confinement in the ITU for other than extremely short periods of time [9] is harmful to OTS students [10] and undermines the legitimate treatment of goals of the institution.[11] Brodsky 13–15; Fannin 68; Draper 31; Cox 60.[12]

The experts strongly rejected the possibility that placement in the ITU would deter the kinds of conduct which put them there. Mr. DeCell, for example, pointed out from his own experience in South Carolina that isolation in a lock-up such as the ITU does not make students penitent but instead increases their hostilities and adds to their behavior problems. DeCell 30–31. Dr. Brodsky found that the students in the ITU showed ". . . little sense of deterrence. They felt much more that they were victims rather than they had learned a lesson." Brodsky 28–29. *See also,* Milan 76, 79.

Courts have uniformly prohibited the use of juvenile lockup facilities such as the ITU. For example, in *Inmates of Boys' Training School v. Affleck, supra,* the district court enjoined the future confinement of juvenile offenders in two maximum security facilities which, like the ITU here, were used to punish students for running away from the institution or for violating its rules. Despite the lack of any physical abuse of the students, the court ordered the facilities closed because

> [t]o confine a boy without exercise, always indoors, almost always in a small cell, with little in the way of education or reading materials, and virtually no visitors from the outside world is to rot away the health of his body, mind and spirit.

346 F.Supp. at 1365–66.[13]

Similarly, in *Lollis v. New York State Department of Social Services, supra,* the court ruled that the isolation of a 14 year old offender in a bare room without reading materials or other recreation for a two-week period constituted cruel and unusual

---

**9.** The experts differed slightly on the maximum period of confinement that should be permitted, although all agreed that any form of isolation such as confinement in the ITU should only be used as a cooling-off or time-out period to allow a student to get himself under control and should never exceed 24 hours. Phelps 61–62; Brodsky 12–13; Milan 82–83; Fannin 76–79; Draper 32; Cox 62. The experts also agreed that even this limited use of the ITU for very short periods of isolation would require substantial improvements in the physical condition and furnishings of the present ITU cells. Brodsky 31, 84; Milan 79–80; Cox 59–60; Fannin 73–74, 95.

**10.** According to OTS records, one student became so depressed about being in the ITU that he thought of suicide and tried to cut both wrists with a piece of wire from his mattress. Sproat II at 30–31 and Exh. P–1 thereto.

**11.** This is not to say that some students do not need to be confined under more secure conditions than presently exist in the regular cottages at OTS. Rather, the experts made clear that some students need more secure arrange-

ments, but they still must receive the full range of treatment services under the more secure conditions. This has been done in South Carolina and in Louisiana, where students needing secure facilities are assigned for all or most of their commitments to maximum security units where they receive a full range of intensive treatment programs on a regular basis. DeCell 87; Phelps 61–67, 69–70. In contrast, the ITU serves merely to isolate the OTS students from all treatment services and in an environment where treatment cannot possibly be successful.

**12.** Isolation at the Mississippi State Penitentiary at Parchman is limited to temporary time-out periods for prisoners who have lost control of themselves. Reed 46–48.

**13.** The court's findings were based on the affidavits of experts which stated that "isolation can never constitute rehabilitation" and can produce "sensory deprivation, withdrawal, or perhaps psychotic or autistic behavior." 346 F.Supp. at 1366.

punishment barred by the Eighth Amendment. 322 F.Supp. 482–83. The court relied upon the affidavits of seven experts who unanimously agreed that extended isolation imposed on children is "not only cruel and inhuman, but counterproductive to the development of the child." 322 F.Supp. at 480.[14]

In *Nelson v. Heyne, supra,* the district court enjoined the continued use of isolation cottages for disciplinary purposes on the basis of expert testimony "that prolonged and total isolation . . . is emotionally and psychologically debilitating and serves neither treatment nor punitive goals." 355 F.Supp. at 456. The conditions in these cottages were remarkably similar to the conditions in the ITU: students could be confined for 5 to 30 days, although there was evidence that this limit had been exceeded in individual cases; the confinement rooms were $9' \times 12'$ in size, and contained only a bed and toilet; students had little contact with the school's counseling and psychological staff and their academic or vocational programs were suspended. 355 F.Supp. at 456.

This court finds that confinement of students under the conditions that presently exist in the ITU at OTS constitutes cruel and unusual punishment as prohibited by the Eighth Amendment to the United States Constitution and violates the students' right to rehabilitation and treatment, as guaranteed by the due process clause of the Fourteenth Amendment. The defendants will therefore be enjoined from using the ITU as an isolation unit, except under the following limited conditions which are necessary to insure that placement therein will not do any emotional or psychological harm to the students: students may not be placed in the ITU except where there is substantial evidence that they constitute an immediate threat to the physical well-being of themselves or others; confinement may not exceed 24 hours and must be approved within one hour of the confinement by the Superintendent, one of the Assistant Superintendents, the Chief Counselor or a staff psychologist;[15] students in the ITU must be visited at least once every three hours during the day by the Chief Counselor, the students' own counselor or a licensed psychologist;[16] the cells in the ITU must be provided with transparent windows, lights, mattresses, blankets, sheets, pillows, small tables for reading, chairs, soap and towels; unless a contrary program is indicated in an individual case by a licensed psychologist, students placed in the ITU must be permitted to sleep a reasonable time during the day, to have reading materials, to send and receive mail, and to have visitors; the students must receive daily at least an hour's physical exercise outside of the ITU or in the gym; and they must be allowed to eat their meals outside of their cells.

## V. TREATMENT PROGRAM.

In enforcing the constitutional right to treatment for juveniles, courts have not attempted to define the particular treatment program which is appropriate for specific individuals, but instead have required certain fundamental conditions in an institution which will allow adequate treatment to take place. As delineated by the courts and reaffirmed by the experts testifying in this cause, these fundamental conditions are: (1) the institution's entire program must be geared to meet the individual needs of each student; *Nelson v. Heyne,*

14. Excerpts from the expert affidavits are quoted at 322 F.Supp. 481–482.

15. The use of the ITU raises special problems for OTS students who are retarded or who have psychological problems. Experts testified that the population of juvenile institutions such as OTS is likely to include significant numbers of students with these special problems. Phelps 19; Cox 9–10. Courts have prohibited the use of isolation for the retarded and for psychologically disturbed persons. *Welsch v. Likins, su-*

pra at 503; *New York State Ass'n for Retarded Children v. Rockefeller,* 357 F.Supp. 752, 768 (E.D.N.Y.1973). The Court expects that defendants will not approve confinement in the ITU or any other form of isolation for students whose psychological, emotional or intellectual status make isolation inappropriate.

16. At Parchman, the State penitentiary, any prisoner who is placed in isolation must be seen immediately by a psychologist or a psychiatrist. Reed 47–48.

*supra,* 491 F.2d at 360; (2) the institution must employ sufficient numbers of qualified professional and support personnel to enable it to provide the individualized programs found to be appropriate for each student; *Martarella v. Kelley, supra* at 601; *Inmates of Boys' Training School v. Affleck, supra* at 1374; (3) the institution must provide an environment which is conducive to rehabilitation as well as sufficient programs, including education, vocational training, and recreation, to enable the students to obtain the necessary skills to return to society. *Inmates of Boys' Training School v. Affleck, supra* at 1369–1370. The evidence of record demonstrates that none of these fundamental conditions of rehabilitation for juveniles are met at OTS.

### A. Individualized Programs

■ In *Nelson v. Heyne, supra,* the Court of Appeals for the Seventh Circuit explained the basis for requiring individualized programs as follows:

> In our view the "right to treatment" includes the right to minimum acceptable standards of care and treatment for juveniles and the right to *individualized* care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ. When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide. Without a program of

individual treatment the result may be that the juveniles will not be rehabilitated, but warehoused, and that at the termination of detention they will likely be incapable of taking their proper places in free society; their interests and those of the state and the school thereby being defeated.

491 F.2d at 360 (emphasis in original). The importance of this point is underscored by the wide range of conduct for which juveniles may be committed to institutions such as OTS. Students at OTS may include eighteen-year-olds whose conduct violated the state's criminal laws, as well as younger boys whose only problem was that they did not get along well in school or had created problems for their families.

According to the expert testimony, in order for OTS to provide individualized programs for its students, incoming students must be fully evaluated to obtain basic educational, medical, psychological and vocational information.[17] Cox 12–15; Draper 22; Milan 12; Fannin 21; DeCell 17–18. OTS has no such evaluation procedure.[18] Pretrial Order ¶ G(25–26) at 18–19. Instead, OTS only has the part-time services of a consultant psychologist, Dr. Daniel Cox. Dr. Cox, a Court-appointed expert witness in this case, candidly testified that these services are insufficient to evaluate OTS students adequately, Cox 23, and that a diagnostic and evaluation center headed by a licensed psychologist[19] is needed at OTS. Cox 12, 24, 68–71.

---

17. Evaluations are also essential to enable OTS to identify incoming students with special emotional or mental problems who should not be assigned to OTS but to another institution, Draper 23; Milan 12–13; as well as to identify students who may have contagious diseases or who need immediate medical attention. Cox 14–15; DeCell 16.

18. During 1974, OTS maintained a reception and evaluation center under the direction of a full-time, licensed psychologist. Incoming students received medical, educational and psychological evaluations which were intended to identify their needs and to serve as the basis for further programmatic decisions. However, the psychologist left the OTS staff in early 1975, and since that time the reception center has remained closed. Sproat I at 52–57.

19. The other experts agreed with Dr. Cox that the evaluation process must be directed by a licensed psychologist. Draper 22; Milan 17; DeCell 18–19.

In South Carolina, every juvenile offender receives a 45-day evaluation at a special reception and evaluation center. DeCell 17. The center is staffed by a Chief Psychologist, who is completing work for his Ph.D. degree, and a number of other psychologists and social workers. DeCell 44. The students are given an "intensive social, psychological, psychiatric, medical, academic and vocational work-up. . . ." DeCell 17. In Louisiana, incoming students spend two weeks at a reception and diagnostic center where they receive a psychological, educational, medical and social evalua-

The experts also testified that individualized treatment plans must be prepared for each OTS student, contrary to present practice. Pretrial Order ¶ G(12) and (22) at 14, 18. These plans should describe in precise terms the school's long- and short-term objectives for the student and the full range of services to be provided. Timetables and staff assignments should also be indicated. Cox 69–70; Milan 20–21; Fannin 26.

Written treatment plans are necessary to insure that the entire OTS program is devoted to meeting the students' individualized needs for care and treatment. "Without a formal construction of an individualized treatment plan . . . [t]here is no such thing as a service oriented institution." Cox 30. Dr. Milan described the function of the treatment plan as insuring that the school's programs focus on the students' identifiable needs as well as permitting regular re-evaluations of the services being provided. Milan 22–23.[20] Finally, Dr. Draper and Dr. Fannin testified that treatment plans are essential as a means of assuring accountability of staff to students. Draper 20–21; Fannin 26–27.[21]

Students at OTS are placed in residential facilities or cottages without regard to their age, prior social history, reason for confinement or individual treatment needs, but solely on the basis of vacancies and the maintenance of a fixed black-white ratio in each cottage. Pretrial Order ¶ G(27) at 19. Dr. Cox considers this process to be "random and confused" and stated that it did not allow students a reasonable opportunity to be rehabilitated. Cox 33. In addition to exposing younger and less aggressive students to the older and more "criminal" elements at the school,[22] the haphazard placement of students provides little opportunity for the effective use of peer group pressure in the students' treatment, Cox 34–37,[23] and it does not allow the matching of students with compatible counseling and supervisory staff.

---

tion. Phelps 33. Mr. Phelps testified that this evaluation is the key to the juvenile corrections system in Louisiana. Phelps 33. Prisoners at the Mississippi State Penitentiary receive a complete physical examination, an academic evaluation and a battery of psychological tests when they arrive. Reed 33–36. Prisoners for whom further diagnosis is required also are referred for psychiatric evaluations. Reed 35.

20. Dr. Milan testified:
This gives to [the student], first of all, a certain security. He knows what's going to be happening to him during his stay here. Secondly, it gives him a means of evaluating his progress in the program. . . . It also controls the activities of the staff, and the staff can then key in on the treatment program and attack each one of these problems in the logical sequence. It also tells the staff how the student is progressing, where he is, whether or not he is going as rapidly as it is expected that he will go, and if he's not, it serves as a warning sign that there is something the matter with either the treatment program or the procedures that are being employed in the implementation of that program. . . .
Milan 22–23.

21. In the South Carolina juvenile corrections system, a written workup is done on each student which serves as the basis for his or her treatment program. DeCell 49–50. In Louisiana, written treatment plans are also prepared for each student. These plans are "the basic document[s] upon which everything else will be built as far as institutionalization is concerned . . . .." Phelps 33.

22. For example, one student committed to OTS when the evaluation center was in operation received recommendations by the staff psychologist: "Extreme caution required at all times in working with subject", "Alert to homicidal tendencies", and "Alert to use of weapons." Nevertheless, the student was placed in Phase I cottage solely on a space-available basis. Sproat II at 31–32.

23. In contrast to the OTS approach, Dr. Cox recommended a system that identifies particular juvenile peer groups and places each person in a cottage housing boys at a similar stage of social and emotional development. Each cottage group would live together for their entire stay at the training school with the same cottage parents and counselor. Peer group pressures could then be controlled and constructively utilized by the staff to help individual students learn interpersonal skills. Students would also receive encouragement from seeing that peers with similar problems, develop, grow and are gradually paroled. Cox 34–37, 76–78. Such a system would greatly reduce the current pressure on a juvenile to adjust to a constantly changing set of peer group situations and loyalties—a pressure which Dr. Cox found to be contra-therapeutic. Cox 36.

Finally, the experts are of the opinion that there must be regular procedures to determine whether a student is making progress toward the treatment objectives set for him. Milan 22–23; Cox 32. Dr. Cox explained the role of regular program reviews as follows:

> At this time there may be need for additional formal assessment. We may have to scrap the whole program and start over again. We may have to make certain adjustments . . . in all cases at this 30 day period I have never witnessed in my experience any program which was not adjusted in some way . . ., because we've had 30 days of observation of the child in this situation . . . .

Cox 32.

Although counselors at OTS are supposed to follow the students' development, they do not have regular conferences with the students' teachers, recreation supervisors or job supervisors, nor do they receive periodic reports from other staff members who work with their students. Unless there are severe behavior problems, no full staff evaluations are conducted on individual students. Pretrial Order ¶ G(12) at 14.

The failure of OTS to evaluate and re-evaluate the individual needs of its students completely undermines the rehabilitative purposes of the training school. Therefore, the defendants will be ordered to submit a plan to establish a complete diagnostic and evaluation procedure for all incoming students and all present OTS students who have been at the school for less than 90 days. In addition, defendants will be ordered to formulate individualized written treatment plans for all students, in accordance with generally accepted professional standards, to determine cottage placements on the basis of the students' individual needs and programs as set forth in the treatment plans, and to institute a program of periodic staff reviews and evaluation of these students' progress. The evaluation process and the preparation and re-evaluation of treatment plans shall be supervised and coordinated by a licensed psychologist.

### B. Treatment Staff

■ The experts testified that a staff sufficient to provide minimally adequate treatment at OTS must include the following personnel: (1) at least one full-time licensed psychologist or psychiatrist to coordinate and supervise the treatment program; (2) a sufficient number of qualified counselors to implement the treatment program and to provide individual and group counseling to the students; (3) a sufficient number of qualified cottage parents to supervise the daily cottage life; (4) sufficient outside consultant services to provide specialized psychological, psychiatric and medical services where needed. The experts also stressed the need for in-service and other training programs for all treatment staff. It is clear from the record that OTS does not meet any of these minimal standards.

(1) *Staff Psychologist.* The record shows that only doctorate level psychologists or psychiatrists have adequate training to coordinate and supervise the treatment program.[24] Cox 42; Draper 19–20. However, as has already been noted, OTS does not have a full-time psychologist on its staff. The present part-time consultant arrangement makes no provision for psychological counseling or therapy to individual students and the psychologist is not involved in the development of individual treatment programs. Cox 29. Defendants testified that they have for some time been attempting to employ a staff psychologist to serve both OTS and the Columbia Training School, which is located approximately 100 miles from OTS. Russell 13–14. However, the uncontradicted evidence is that at least one

---

24. The experts testified that doctorate-level psychologists or psychiatrists are needed to interpret psychological tests and interview students at intake, Milan 17; Draper 22; Cox 16–17, 24–25; to head the staffing sessions in the planning of individual treatment programs, Cox 68, 75; to supervise the provision of therapy by counselors, Cox 42–43; Milan 60–61; to conduct in-service training for all staff members, Cox 81; Fannin 34–35; Draper 40; Milan 69; and to aid in the selection and screening of staff, Cox 80; Milan 65; Fannin 33.

full-time psychologist must be employed to serve the OTS population, Cox 24–25; Draper 20; Milan 59–60; [25] Brodsky 41; De-Cell 19; and the Court finds that a single psychologist to serve both institutions will not satisfy defendants' constitutional duty.

(2) *Counselors.* Master's level social workers or counselors must be employed in sufficient numbers to provide adequate treatment to juveniles. Cox 37–38; Draper 19; Milan 63. The experts testified that the counselor/student ratio must not exceed 1:15–20 for the counselors to do their job adequately. Cox 43, 44; Draper 17; Milan 63.

OTS accepts counselors if they have an undergraduate college degree in one of the behavioral sciences. Counselors are not required to have prior experience working with adolescents, nor are they required to take courses in social work or child psychology after they are hired. Pretrial Order ¶ G(11) at 13. None of the present counselors has a master's degree, Milan 33, and OTS has no inservice or pre-service training program for its counselors, although experts testified that continuous on-the-job training is essential. Cox 42; [26] Draper 19; Brodsky 41.

Each OTS counselor has a caseload of approximately 40–55 boys and works 40 hours per week. Counselors generally have no more than 10–15 hours a week available for individual counseling sessions with the students. As a result, there are no regular or systematic counseling sessions for each student.[27] If a student does not request to talk with his counselor and has not caused any severe discipline problems, he may only meet with his counselor once or twice during his entire stay in a cottage. Pretrial Order ¶ G(10) at 13. Under these circumstances, the experts agreed that OTS is unable to provide minimally adequate treatment to its students:

> The counselors' case loads . . . preclude any individualized treatment . . . It's tactically and strategically impossible for a counselor who is responsible for fifty students to spend the time required with each in either individual or group counseling, to deal with [social and interpersonal] problems. Milan 32.

> [The consequence of exceeding the 1:15 counselor/student ratio is that] you immediately defeat the whole purpose of an individualized treatment program by cutting your services to individuals. You immediately place a burden on the counselor that would have to be adjusted by seeing greater numbers of children for lesser periods of time, meaning the counselor could not devote his entire atten-

25. Dr. Milan felt that this was a highly conservative estimate given the tasks outlined above:

 Diagnostic and evaluation is a full-time job. The person who's responsible for that is, of necessity, devoting his full efforts to that, so you need psychologists who specialize in that kind of work doing—performing that kind of task. Above and beyond that, now, we're talking about the implementation of treatment programs. The President's Commission on Law Enforcement and the Administration of Justice again specifies that the minimum acceptable ratio between psychologists and delinquents in the training school setting such as Oakley is one to 150, so that means that at a minimum, you need one psychologist there charged with the responsibility of performing diagnostic workups and considering there are between 250–300 students and there's been as many as 350, a minimum of two, and if the population expands, three additional psychologists charged with the responsibility of implementing and overseeing intervention programs.

 Milan 59–60.

26. Dr. Cox testified:

 The people that we have already identified as being acceptable at the counselor level do not have their terminal degrees, and while they may have some experience, it's very important that they continue their education and growth in their area of expertise, meaning offering therapy services. There are continuing developments in the field of counseling, therapy and guidance and they must be kept up to date as to the different programs and different advancements in community mental health care at an institution such as Oakley.

 Cox 42.

27. One of the OTS counselors testified that there is "[t]oo great of a case load for the counselors to be able to work specifically with the students in a really significant or meaningful manner." Gladfelter 53.

tions to the needs of any of his people. He would be spread too thin, and of course this is damaging. Cox 44.

*See also,* Brodsky 41.

(3) *Cottage Parents.* All of the experts agreed that cottage parents are the critical staff members in the rehabilitation of delinquent youth because of their close and continuous contact with the students. Phelps 22; Cox 50; Fannin 37; Draper 38–39; Milan 67; Russell 10, 20. While one expert testified that cottage parents should have a bachelor's degree, Cox 50, most of the remaining witnesses agreed that cottage parents must have at least a high school education. Russell 29; Milan 64; Fannin 31; Draper 15. An extensive pre-service and in-service program is mandatory to insure that cottage parents can cope effectively with the particular problems of delinquent youth. Cox 81–83; Draper 15, 39; Fannin 31, 34–35; Milan 67–68. Finally, the parties stipulated that a cottage parent/student ratio of 1:20 is a minimally adequate ratio. Pretrial Order ¶ G(9) at 13.

Almost half of the OTS cottage parents do not have a high school education and very few have had any prior experience [28] which would aid them in working with the OTS students.[29] Pretrial Order ¶ G(6) at 11–12. Moreover, they do not receive any preservice or in-service training. Pretrial Order ¶ G(5) at 10.

OTS cottage parents are responsible for supervising from 40 to as many as 55 students. Pretrial Order ¶ G(7) at 12. Consequently, their time is spent maintaining order and enforcing the OTS rules, Pretrial

Order ¶ B(8) at 12, and it is impossible for them to perform any meaningful treatment function. Phelps 22. Dr. Milan described this problem:

> Houseparents with whom I talked described themselves as sitters and this is also indicated in depositions. They look at themselves as responsible for order and discipline and protection of students from other students. They don't see themselves formally as members of a treatment team. They act in a manner appropriate to this self-definition . . . If he's going to be anything other than this, three things must be done. One, that his role has to be redefined. He is to be redefined as an on-line member of a treatment or behavior modification team. Secondly, he has to be provided the skills necessary to function as a member of the treatment team and thirdly, the ratio between houseparent and student must be reduced so that he can practice the skills with which he has been provided.

Milan 66–67.

(4) *Consultant Services.* The experts also testified that OTS must have access to a wide range of psychological, psychiatric and medical services to meet specialized treatment needs of its students. Draper 18, 23; Cox 18, 23–24; Milan 60. A systematic evaluation procedure for incoming students would be meaningless unless services are provided to meet the students' individual rehabilitative needs revealed by the evaluation. Thus, some students will require individual and group psychotherapy, Draper 18, neurological services,[30] Cox 18, psychiatric consultation,[31] Cox 23, speech and hearing

---

**28.** Examples of the present cottage parents' previous occupations are farmworker, maid, grocery clerk, truck driver, plumber, janitor. Pretrial Order ¶ G(16) at 11–12.

**29.** The proof indicates that better qualified cottage parents are available, Fannin 38, but the OTS pay scale is too low to attract qualified individuals. Sproat I 162–163; Russell 21–22.

**30.** Dr. Cox found that 25% of the students whom he had screened since September 1, 1975 needed further services by a neurologist, but only 2–3% had actually been referred. Cox 18.

**31.** The records introduced by plaintiffs graphically reveal the need for psychiatric services at

OTS. For example, one student, "D.B.," over an eleven-month period, attempted to cut his wrists with a piece of wire, later cut one of his wrists with the top of a metal box, ran away from OTS and was returned with a report from New York State authorities that he had attempted suicide by going over Niagara Falls. He was placed in ITU for a period of 34 days, and three days after being released therefrom, he was found with three pieces of a razor blade in his mouth threatening to swallow them. A month later he was released from OTS. During his entire stay at OTS, D.B. received no psychiatric or psychological treatment. Sproat II at 30–36.

specialized services,[32] Cox 23–24. Such services are clearly necessary for the rehabilitation of OTS students.

It is essential that these staff deficiencies be corrected to enable OTS to provide minimally adequate treatment for the juveniles confined there. Therefore, the Court will require the defendants (1) to employ a full-time licensed staff psychologist (or psychiatrist) at OTS to supervise the school's evaluation and treatment programs; (2) to employ sufficient counselors, with at least a master's degree in social work, counseling, or one of the behavioral sciences, to achieve a maximum counselor/student ratio of 1:20; (3) to employ sufficient cottage parents, with at least a high school degree, to achieve a maximum house parent/student ratio of 1:20; (4) to contract with outside specialists to provide all of the consultant services necessary to meet the needs of OTS students, including psychiatric, neurological, medical, and eye and ear services; and (5) to submit within a prescribed reasonable time, a plan for a program of pre-service and regular in-service training for counselors and cottage parents at OTS.

C. *Progressive Phase Program.*

In June 1972, this Court permanently enjoined these defendants' predecessors from using a program whereby the progress of students through OTS was determined by their avoidance of rule infractions. *Crump v. Board of Trustees, Mississippi State Training School,* C.A. No. 72J–88(N) (S.D.Miss., July 5, 1972); Exh. P–56. After the issuance of that injunction, defendant Sproat and the former staff psychologist designed a "differential treatment program" which, at least on its face, was an effort to provide some individualized treatment services to the OTS population. The differential treatment program was never implemented because of the lack of staff and resources at OTS. Sproat I at 156–157 and Exh. 12 thereto. Instead, defendants established a progressive phase program, which is in all essential respects identical to the program previously enjoined by this Court.

The Progressive Phase Program is a method of moving students through a sequence of cottages until they are deemed ready for parole. Pretrial Order ¶ G(2) at 10. To move from one phase to another, a student must ordinarily receive passing grades from his counselor for eight consecutive weeks. Pretrial Order ¶ G(29) at 19–20. Grades are determined primarily by the number of "white slips" issued to the student. Pretrial Order ¶ G(18) at 16. A white slip is a small standardized form which contains spaces to indicate six categories of unacceptable behavior: work unsatisfactory, disobeys staff member, acting up in general, fighting, attempting to run, and use of profanity. Pretrial Order ¶ G(13) at 15; Exh. P–42.

All OTS employees are required to report unacceptable behavior on these slips, but the employees have not received any in-

---

Another student, "T.C.S.," engaged in a series of self-destructive and property-destructive incidents at OTS. On one occasion he received ten licks with a wooden paddle as punishment for attempting suicide. Although OTS recognized T.C.S.'s need for psychiatric treatment by attempting to have him committed to a state mental institution, this child received no psychiatric treatment during his confinement at OTS for a period in excess of one year. Sproat II at 36–38.

Another OTS student, "A.G.," was taken to the emergency room in Hinds General Hospital on December 26, 1974 suffering from seven self-inflicted razor cuts on both arms. Upon his return to OTS he was placed in the ITU for 3–4 days. He was provided no psychological or psychiatric assistance. On February 18, 1975, A.G. cut his wrist again, and was treated in the Oakley Training School clinic. He again received no psychological or psychiatric assistance. On July 29, 1975, A.G. suffered self-inflicted razor blade lacerations on his neck and was given medical treatment but no psychiatric or psychological treatment. On August 6, 1975, A.G. again received self-inflicted wounds, following which he was placed in the ITU. Four days later, he was finally evaluated by a psychologist and subsequently transferred to a state mental institution. Sproat II 23–25; Williams 30–35.

32. For example, student "T.C.S.," was determined by the former OTS evaluation psychologist to be in need of referral to an eye specialist and a hearing specialist. These referrals were never made. Sproat II at 36–37.

struction to clarify the offenses. Pretrial Order ¶ G(13) at 15. As a result, white slips have been given for such petty conduct as getting a drink of water without permission, sleeping at 4:30 in the afternoon, and wearing shoes inside the cottage, Pretrial Order ¶ G(14) at 15; and the frequency with which white slips are used and the types of behavior for which white slips are given vary greatly among staff members. Pretrial Order ¶ G(15) at 15. Finally, there is no standardized method for reporting good or positive individual student actions, and student records are almost totally devoid of good behavior reports. Pretrial Order ¶ G(17) at 16.

The progressive phase program is supposed to be based on behavior modification[33] techniques. Pretrial Order ¶ G(2) at 10. However, the behavior modification specialists who evaluated the phase program found that it violated all of the basic principles of behavior modification. They noted in particular the lack of consistency, the failure to specify concrete and limited goals for each student, the absence of sufficient positive incentives to generate appropriate behavior, the long delay in giving any rewards for achievement, and the placement of the greatest rewards at the end of a student's stay rather than at the beginning. Draper 7–9; Milan 43–52.

The experts were particularly critical of the fact that students' progress through the phase system is based entirely on their avoiding unacceptable behavior, i. e., staying out of trouble. Pretrial Order ¶ G(21) at 17; Draper 8–10; Milan 46. They concluded, that as a result of the program's negative focus, it inhibits rehabilitation, Draper 9, 14; Cox 54–56; Milan 46.[34] While negative (aversive) programs may be able to stop certain behaviors for a short time, this effect soon dissipates, and the

**33.** Behavior modification programs have as their primary purpose the reinforcing of good behavior with artificial rewards in an organized and systematic fashion so that an individual will move toward a goal or set of goals that will eventually provide their own natural reinforcements. For example, a student might be given additional hours off the institutional grounds at a special event as a reward for finishing a vocational assignment. As the student gradually develops vocational skills, the rewards can be withdrawn and the vocational skills will take on their own natural reinforcing characteristics, i. e., the ability to obtain a job and earn money. Draper 10; Milan 43–44. Because the phase program at OTS fails to meet even the basic requirements for a behavior modification program, the Court has no occasion to decide in the abstract whether behavior modification programs can satisfy the Constitutional right to treatment for juvenile offenders.

**34.** The experts testified:

In general I consider [the white slip system] damaging to a child psychologically and emotionally. Behavioral modification of adolescents in an institution such as Oakley must always be based on positive reinforcement for correct behavior . . .. A child receives negative reinforcement when he behaves incorrectly and does not receive sufficient reward. When he behaves correctly, therefore a child becomes only aware of himself as a negative individual . . .. The white slip system as it now exists at Oakley should be abolished. Cox 54–56.

[O]ne of the things you want to do in a rehabilitation program is to generate appropriate behaviors, to have the individual see himself as a competent human being, somebody who has skills, abilities that he can utilize in the world. He's not doing that here. All he really gets, again in a systematic way, is . . . criticism from people and that's kind of the way he learns to see himself. Draper 9.

[The white slip system], in no way, really shapes an individual's behavior to have him function adequately in the outside environment again. It is entirely devoted at suppressing behaviors and it seems that the adolescent that could go through there the smoothest would be an individual who is withdrawn and quiet and produced no problems and yet he may not really gain anything there either. Draper 14.

[T]he phase program does not focus on achievements and positive behavior; it, instead, is designed primarily to suppress and eliminate undesirable behaviors. If a person does nothing, that is, remains quiet and subservient and docile and doesn't come to the attention of anybody, he will progress through the entire program at the optimum level . . .. Milan 46.

I don't think that the Progressive Phase program, as it now exists, has any positive impact on students at the training school. For reasons that I've discussed previously, I think the impact of the program is negative and, at best, is neutral, certainly is not positive. Milan 72.

objectionable behavior tends to return when the controls are lifted. Draper 9; Milan 128–129. Moreover, negative controls are specific to the behaviors which are targeted for control, so that they do not have any transferable impact on other student behaviors which may need correction. Milan 56. They destroy a student's sense of self-worth, which is essential for rehabilitation, Draper 11, and fighting and other unwanted conduct actually increase. Milan 54–55.[35]

The experts agreed that behavior modification techniques, even if properly applied, cannot substitute for inadequate staff and programs in other areas at OTS, such as counseling, education, vocational training, and recreation. If these program elements are deficient, as they clearly are at OTS, then the addition of a point system or token economy or any other similar behavior modification approach will not create an adequate treatment program. Draper 12–13, 18, 42–44; Cox 54–55; Milan 39–42, 58–59, 67; DeCell 93.

The Court therefore concludes that the Progressive Phase System does not provide minimally adequate treatment as required by the Constitution and is in fact counter-rehabilitative. The defendants will be enjoined from the continued operation of that system [36] and will be ordered to submit a plan to the Court for the determination of students' progress at OTS, including their readiness for parole or release.

### D. *Institutional Life.*

 The experts agreed that in order to render minimally adequate treatment to its students, OTS must maintain a physical environment at the school that is not detri-

mental to the students' rehabilitation. Students at OTS live in eight residential cottages, Pretrial Order ¶ E(2) at 8, one of which, Foster Cottage, was used as the reception and evaluation unit until September, 1975. Pretrial Order ¶ G(22) at 17. With the exception of Foster, the cottages were built between 1944 and 1961. Pretrial Order ¶ E(2) at 8. Despite their age, the cottages are in satisfactory repair and are kept clean.[37] Brodsky 69; Reed 6; DeCell 14. However, the experts were deeply concerned about the extent to which overcrowding and lack of privacy in the cottages interferes with the school's rehabilitative function. Defendants, it appears, substantially agree with these criticisms and are seeking funds to construct new residential facilities.

Approximately 40 to 50 students are assigned to each of the residential cottages. Pretrial Order ¶ C(6) and F(1) at 6, 8. The cottages are generally impersonal, and there are no pictures or other decorations to make them more humane and comfortable for the students. Milan 131–132; Exhs. P–10, P–19. Except in the pre-release (Rowan) cottage, where students live in small rooms, students sleep in a single bay-style room, approximately 1900 square feet in size. Pretrial Order ¶ F(1) at 8. There is no furniture in the sleeping areas except for the beds. The students' clothing is kept in a separate common room. Exhs. P–6, –7. Personal possessions are kept in a "box" room, Exh. P–18, and students must receive permission and assistance from their counselor to obtain possessions kept in the box. Pretrial Order ¶ F(2) at 8–9.

In addition to the sleeping area, each of the residential cottages has a day room, a

---

**35.** The negative approach taken by OTS should be contrasted with the token economy program used in the South Carolina juvenile system, which is designed to promote positive behavior by the students. DeCell 90–94; Exh. 1 thereto at 20–21.

**36.** On November 30, 1976 the defendants filed with the Court a document entitled "Differential Classification: A Pilot Program," which outlines their proposed modifications to the progressive phase system. Inasmuch as the

plaintiffs have not had an opportunity to respond to this proposal, the Court does not at this time consider the adequacy of the modifications proposed therein.

**37.** One expert pointed out that OTS's failure to conduct regular fire inspections of its facilities constitutes a hazard which must be corrected. DeCell 14–15. Defendants will be ordered to institute a regular program of fire inspections by the appropriate authorities.

shower/toilet area, and a small office for the institutional counselor. The day rooms are approximately 900 square feet in size, Pretrial Order ¶ F(3) at 9, and they are furnished with chairs, tables and a television. With the exception of the toilets in the pre-release and reception cottages, the toilets and showers in the cottages are not separated by partitions. Pretrial Order ¶ F(5) at 9.

The evidence of record demonstrates that the sleeping areas and day rooms in the OTS do not meet the minimum space requirements for the number of students confined there.[38] Overcrowding is especially acute in the day rooms, because students are confined in these areas for much of their day. Under OTS policy, the students must remain in the day room when they are not in school, on work-detail or at the gym. Pretrial Order ¶ F(3) at 9. They are not permitted in the dormitory area during the day, Pretrial Order ¶ F(3) at 9, and they must receive permission to enter the toilet area. Pretrial Order ¶ G(28) at 19. Individual students are not permitted outside of the cottages except with the whole group. Pretrial Order ¶ F(3) at 9.

According to the experts, overcrowding in residential areas creates a hostile, chaotic environment which is counter-therapeutic to the needs of the students and results in fights and irritability. Milan 86; Brodsky 53–54; Phelps 45.

The experts also testified that the lack of privacy in the cottages makes it impossible to conduct even a minimal treatment program because most adolescents are in a period of emotional "turmoil" and need space where they can be alone and try to "think their problems out". Fannin 11(a); Cox 56. Students also need free access to their own possessions[39] and need their own space where they are not part of the group in order to achieve a sense of dignity and responsibility. Brodsky 50–51; Milan 87;[40] Fannin 19.[41]

Finally, smaller living arrangements are more akin to conditions in the outside world, and, unlike the large group living areas at OTS, enable the students to learn

---

**38.** Several of the experts testified that 80 square feet per student is the accepted minimum standard for institutions such as OTS. Phelps 12; Brodsky 53. In *Davis v. Watkins*, 384 F.Supp. 1196 (N.D.Ohio 1974), and *Wyatt v. Stickney*, 344 F.Supp. 387, 404 (N.D.Ala. 1972), aff'd in pertinent part; 503 F.2d 1305 (5th Cir. 1974), the courts accepted a standard of 80 square feet per resident for sleeping areas and 40 square feet per resident for day rooms. None of the residential cottages satisfies both the 80 square foot standard for sleeping areas and the 40 square foot standard for day rooms. Pls. Exh. 1 to Russell Dep. Even at less than maximum capacity, several of the dormitories contain less than 50 square feet per student, and several of the day rooms contain less than 25 square feet per student. *Cf. Williams v. Edwards, supra.*

**39.** Reed testified that prisoners at Parchman have free access to their own lockers or locker boxes in which they store their personal possessions. Reed 50–51.

**40.** Dr. Milan stated that the lack of privacy makes rehabilitation extremely difficult because it communicates to the students:

. . . that they are not trustworthy, they are not responsible, they are not deserving of being treated with basic dignity . . . and when we communicate to somebody that he is untrustworthy, not to be trusted, he will engage in untrustworthy behavior. Milan 87.

**41.** Dr. Fannin testified:

There are certain types of emotional and/or behavioral problems for which therapeutically a certain amount of privacy is indicated if you're going to have a positive therapeutic effect. There are some where this is a less important type of a requirement. I think that basically what you can say in general is that for the most part adolescents who get to a place like Oakley have had a background which has been lacking in many of what most people would consider to be the normal socio-cultural attributes of living, and that part of the corrective experience of being in a treatment milieu is to provide them with some of these comforts, conveniences perhaps, rights and privileges which they have not had access to in the past. And this accomplishes several things. . . . It gives a message to them that they are worth something to other people. And this very frequently is very helpful and oftentimes may be the first step toward them beginning to see themselves in a much more positive light, which is a necessary thing to have to happen. Fannin 19.

to relate to other individuals in positive and successful ways. Brodsky 64.[42]

Defendants are aware of the problems caused by the size and condition of the OTS cottages. Superintendent Sproat testified that the placement of 40–50 students in the OTS cottages makes it impossible to implement an individualized treatment program, and that he had proposed replacing four of the present cottages with eight smaller cottages, which would house no more than 20 to 25 students. Sproat I at 63–64. Russell testified that the present cottages are "totally too large to [be] conduc[ive] to any adequate rehabilitation in one living facility." Russell 5. He also stated that construction of new cottages has been defendants' top construction priority since 1973, but that their request for funds has been rejected on three occasions. Russell 6. In 1975, the state Budget Commission approved construction of eight new cottages (as well as other new facilities). Russell 6. The record does not indicate whether the Budget Commission's recommendation was accepted by the Mississippi legislature or whether adequate funds were appropriated for construction of new cottages at OTS.

In light of the expert testimony concerning the harmful conditions existing in the present OTS cottages, as well as defendants' own recognition that new cottages must be built if OTS is to serve its rehabilitative function, the Court finds that the present OTS cottages are inadequate. Defendants will be ordered to report to the Court by no later than 30 days from the date hereof regarding the action taken by the Mississippi legislature on the OTS request for capital improvements. If the request is refused, the Court is prepared to take necessary steps to insure that the constitutional rights of the students are protected. If the OTS request is granted, defendants will be required to submit to the Court, also within 30 days, plans for the construction of the new cottages within a reasonable period of time.

### E. Educational, Vocational and Recreational Programs

 OTS must provide adequate educational, vocational and recreational services to its students if it is to maintain a minimally adequate treatment program. Cox 19–22, 26–28, 74–75; Draper 12–13, 42–44; Milan 39–42; Bell 32; Fannin 11a, 56–58. Dr. Milan, for example, described the need for basic educational programs:

> Training schools for delinquent youths in general and the Oakley Training School in particular have students who are severely deficient in academic skills. What I'm referring to now are basic survival skills, the ability to read, the ability to write and the ability to perform basic arithmetic computations. It is imperative that the function of the school be to concentrate to remediate these deficiencies, that reason being [that] people who carry these deficiencies with them when they leave here and return to the community don't have legitimate access to the goods and services of the society. They can only expect to be placed in the most menial of jobs, in the most low paying jobs with little if any hope for advancement and the only alternative to this meager and bleak existence is the return to illegal activities.

Milan 39–40. Dr. Bell described the need for vocational programs:

---

42. The trend in juvenile corrections is clearly away from the large dormitory-type cottages which exist at OTS. DeCell testified that large open-bay dorms are "not preferred" and that "all of us in corrections now are very much in favor of not having conglomerate, large open-bay dorms." DeCell 13–14. DeCell has reconverted two dormitories in South Carolina from bay-style to a number of small private and semi-private rooms, and he has built several new dorms with semi-private living arrangements. DeCell 13. He stated that larger dormitories, such as those at OTS, create a "dangerous situation." DeCell 64. Students in South Carolina also have footlockers in which they can store their own personal belongings. DeCell 65. Phelps testified that the Louisiana juvenile corrections system also uses smaller cottages which allow the students to do different things at different times and that "if you were going to build new dormitories you would not build the same kind that were built [at OTS]." Phelps 11–12. Like DeCell, he also stated that no more than 25 or 30 students should live in the same cottage. Phelps 12, 45.

[A] lot of these youngsters can be helped through a vocational-educational program that combines basic education with some kind of vocational training that will allow them to be at least semi-independent and able to market themselves in some way upon release from treatment. . . . [O]ur experience has been that when young people leave a facility [like] a training school, . . . [and] are not able to have a marketable skill, something that they can get some kind of income on, they are going to pretty much resort back to the same kind of habits of stealing, etc., they had before.

Bell 32.[43] Finally, the experts stressed that recreational programs are an essential part of a minimally adequate treatment program. Cox 90–91; Draper 13; Fannin 55–56; DeCell 12, 58–60; 62–63. The evidence is also overwhelming that the OTS programs in these areas are fundamentally deficient.

*Education.* The academic program at OTS consists of a high school, Pretrial Order ¶ J(16) at 33, an ungraded levels program, which is intended to provide remedial education to students who are achieving below the 9th grade in reading and mathematics, Pretrial Order ¶ J(13) at 32, and two small special education classes for the educable mentally retarded. Pretrial order ¶ J(8) at 31. The experts identified numer-

ous fundamental deficiencies in these programs.

1. OTS students are not evaluated to determine their educational needs. The majority of incoming students arrive without any school records, and, for approximately 50% of the students, prior school records are never received. Pretrial Order ¶ J(3–4) at 30. As a result, OTS has no way to identify students with learning disabilities or other educational problems which need special attention and has no means of developing an education program to meet the individual needs of each student. Pretrial Order ¶ J(4–5) at 30–31; Bell 20–22; Cox 12; Milan 12; Fannin 21; Draper 22.[44]

2. An extremely high percentage of OTS students are retarded or have other problems which require special education services.[45] Pretrial Order ¶ J(7) at 31. However, OTS has virtually no special education programs for these students. At present, there is only one special education teacher who teaches approximately 20 students.[46] Pretrial Order ¶ J(8) at 31. There are no special education services or classes for the trainable mentally retarded, students with specific learning disabilities, emotionally handicapped youth, or hearing and visually impaired students. Pretrial Order ¶ J(10) at 32. OTS students who have these problems receive no services designed to meet their needs.

**43.** Dr. Milan also cited research he had done with juvenile and adult offenders which showed that

> gainful employment [is] highly correlated with success following release. Those people who are gainfully employed, who work a full work week and who make sufficient money to take care of their needs are the least likely to recidivate and so gainful employment is a door to successful post release adjustment. Milan 40.

**44.** Even at the State Penitentiary at Parchman, prisoners receive an education evaluation. Reed 33.

**45.** Based on his screening of OTS students during the past year, Dr. Cox testified:

> [I]t has been my finding through my assessments that roughly 45 to 50% of the children can be categorized as mentally retarded. Another 15 to 20% can be categorized borderline mentally retarded, and typically we would put those two categories together and consider that roughly 65% of the children are

> of subnormal intellectual capacity. . . . [In addition there is] a percentage of neurologically handicapped youngsters, and [those with] learning disabilities, perceptual problems and educational limitations . . . . [R]oughly 90% of all the children in residence at Oakley Training School are in need of some special education, whether it be in the area of learning disabilities or mental retardation, [or] attitude change . . ..
> Cox 9–10.

**46.** This special education class was evaluated in August, 1975 by the State Supervisor of Special Education. He found that the teacher had no information about her students; she was not working with the students; and she was not carrying out any lesson plans. The Supervisor also found that students had not been evaluated prior to placement in the special education program, as required by state law. Pretrial Order Exh. L. at 1–2 and Exh. K.

3. The Mississippi Standards for Accreditation of Elementary and Secondary Schools include curriculum requirements which are applicable to OTS. Pretrial Order ¶ J(22) at 34. The OTS high school, however, does not offer a number of courses required by the accreditation standards. Pretrial Order Exh. M. and ¶ J(17), (19) and (21) at 33–34. Several of the high school teachers are not certified to teach the subjects to which they were assigned by OTS.[47] Bell 16; Sproat II at 22–23; Russell 40. There is a serious absenteeism problem among the teachers, and since OTS has no substitute teachers, students receive no instruction when their teachers are absent. Pretrial Order ¶ J(24) at 34.

4. Although the experts agreed with the basic concept of the levels program, which attempts to focus on specific learning goals for each individual student, they found that the program has not in fact been implemented. There is no testing and retesting of the levels students, no special instructional materials, and no training of the teachers who were in the program. Bell 23–29. Students in the program in fact do not progress beyond their entrance level. Pretrial Order ¶ J(14) at 33. Finally, the school principal described one of the levels classes as amounting to nothing more than babysitting. Bell 28–29.

5. OTS has no training programs for its teachers. Pretrial Order ¶ J(29) at 35. Expert testimony established that inservice training is critical to the educational program at a juvenile institution:

> [I]t serves an instructional role. It provides an organized scheduled opportunity for additional information to be passed to the teachers about the students they are working with, to maximize their effectiveness. [I]t provides an opportunity for teachers to discuss problems that they're having among themselves. This unifies them as a teaching team to come up with treatment approaches, to discuss stu-

dents. I think that kind of feedback within the staff is essential.

Bell 29.

6. One of the Court's experts found that the OTS school building is "very inadequate, obviously old, antiquated . . ." and concluded that the building needs "to be totally replaced." Phelps 8–9. Defendant Russell agreed with this conclusion: "The school building that exists there now is totally beyond renovation; it would not be feasible to even consider trying to renovate or make do with this facility." Russell 6. Defendants have sought state funds to replace the present school. Russell 6.

Defendants will be ordered to submit a plan to remedy each of the deficiencies in its educational program detailed in this opinion. This plan must include specific steps (1) to provide a complete educational assessment of each incoming student, (2) to provide special education services and programs to all students who are diagnosed as needing such services, (3) to establish an inservice training program for all teaching staff, (4) to hire a teaching staff certified to teach in the fields to which they are assigned, (5) to bring their high school programs into compliance with state requirements for public high schools, (6) to institute a periodic testing program to determine the educational progress made by individual students, and (7) to obtain sufficient instructional materials to run an individualized program of instruction that provides rewards for academic progress. In addition, defendants will be ordered to report to the Court within 30 days on the action taken on their request for funds to construct a new school building at OTS. If that request is denied the Court will consider such further relief as may be necessary to insure that OTS students receive the education to which they are entitled.

■ *Vocational Training.* Approximately 180 students at OTS attend vocational classes for three hours a day in one of

---

47. Defendants testified that four high school teachers were teaching "out of their area" and were unable to be recertified to teach in their assigned field. Their cases were being reviewed to determine whether they could obtain the necessary credentials in a reasonable period of time. Sproat II at 22–23; Russell 40.

six trades: shoe repair, welding, auto mechanics, building trades, upholstery, and body and fender. Pretrial Order ¶ J(32) at 35. Two years ago, an evaluation committee appointed by the vocational education division of the State Department of Education found a number of fundamental deficiencies in this program. Pretrial Order Exh. O. The evidence showed that these problems have not yet been cured.

1. One glaring weakness of the vocational program is that large numbers of students receive no training at all. Approximately 40–45% of the OTS students are not enrolled in any vocational classes; they are assigned instead to work crews which perform manual labor on the school farm, janitorial tasks in the cottages, errands in the school and administrative buildings, and work in the OTS laundry, cold storage area, and dining hall. Pretrial Order ¶ K(1) at 36–37. Defendants agreed with the expert testimony that these work assignments do not provide any vocational training. Daniels 23–24. The employees who supervise the crews are not trained instructors, and completion of the work assignments does not earn vocational credit in the public school system. Pretrial Order ¶ K(2) at 37.

2. The evaluation committee also found that the vocational curriculum must be expanded to include additional offerings as well as an occupational orientation program for younger students, and that the hours spent in vocational classes must be increased. Pretrial Order Exh. O. These necessary changes have not been made. Pretrial Order ¶ J(32) at 35; Daniels 20–21; DeCell 34–35, 69. One reason why OTS's vocational program is so limited is that defendants have not made use of off-campus vocational opportunities, including courses at nearby junior colleges and technical schools and work-release programs.

Pretrial Order ¶ J(37) and (38) at 36. A number of the experts stressed both the importance and feasibility of off-campus programs in expanding and improving the vocational training at OTS. Bell 32–34; DeCell 70–71.

3. Students at OTS are not evaluated to determine their vocational aptitude; instead they are placed in vocational classes on the basis of existing vacancies and person preference. Pretrial Order ¶ J(33) at 35. In addition, students are not provided with any assistance in obtaining job placements or further training. Pretrial Order ¶ J(39) at 36. Both the evaluation committee and the experts concluded, and the Superintendent of OTS agreed, that vocational counselors[48] must be employed at OTS to remedy these difficulties. Pretrial Order Exh. O; Daniels 14–15; Milan 35–39; Cox 25–26; Sproat I 39, 108–110. Vocational counselors would evaluate students' vocational aptitude and interests to insure that they receive training for which they are suited. Counselors would also work with local agencies to find job placements for students after they are released and help design the vocational curriculum to insure that it is relevant to the current job market. Daniels 10–12; Milan 37–39; DeCell 70.[49]

Defendants will be ordered to submit a plan to remedy each of the deficiencies in the vocational program detailed in this section of the opinion. The plan must include specific steps: (1) to enable all OTS students who are in need of vocational training to receive it for a period of not less than four hours a day; (2) to expand the present vocational courses to include a wider variety of training programs and an orientation program for younger students; and (3) to employ sufficient vocational counselors to achieve a maximum counselor/student ratio of 1:75.

**48.** Mr. Daniels, the Director of the Career Development Center and Professor of Counseling and Guidance at the University of Southern Mississippi and a member of the state evaluation committee, testified that a ratio of one vocational counselor to 75 students is appropriate in the OTS situation. Daniels 15–16.

**49.** The Superintendent testified that the shoe repair class provides no realistic opportunity for job placements and needs to be replaced. Sproat I at 96.

 .*Recreation.* The recreational facilities at OTS consist of a gym, with two basketball courts, and a recreation hall, with a canteen, a softball diamond, and some indoor game equipment. Pretrial Order ¶ M(3) at 41. The recreation program is supervised by a recreation director and five college students, Pretrial Order ¶ M(5) at 41, and consists of group sports, such as basketball and softball, and a small number of table games such as pool and foosball. H. Cooper 16. As in the educational and vocational areas, the experts identified several serious deficiencies in the OTS recreation program which prevent it from adequately serving the rehabilitation needs of the students.

1. Several of the experts testified that recreation programs must be provided daily and in sufficient amounts to allow students to function in the other parts of their program, Fannin 58–59; Cox 50–52; and that students should have at least one to two hours of recreation each weekday and two to four hours on weekends, when they are not in school. DeCell 11–12; Cox 91. At OTS, however, Phase I[50] students are allowed only 5 hours of recreation a week; Phase II students only nine hours; and Phase III students only twelve-and-a-half hours. Pretrial Order ¶ M(6) at 41; Davis 18–22.

2. The testimony established that an essential goal of treatment programs for juvenile offenders is to teach them to make constructive use of their leisure time. Draper 13; Cox 51; Fannin 56; DeCell 12. The experts were therefore especially concerned that OTS provides almost no unstructured, individual recreational activities which are essential to this goal. Draper 13; Cox 53; Fannin 59–60. For example, there are no leisure time activities such as music, crafts or art, and there are no recreational areas in which students can spend time

outside of their cottages by themselves. Phelps 20.

3. Defendants do not have a physical education program, Sproat II at 21; H. Cooper 21–22, as required by Mississippi law. Pretrial Order Exh. M. The recreation supervisors have not received degrees in either physical education or recreation therapy, H. Cooper 19–21; and, because of their small number, they are unable to give attention to individual students. H. Cooper 22. In contrast to mere recreation, the purpose of physical education is to remedy individual deficits in coordination and motor skills by individualized instruction. This is an essential component of the students' overall treatment program because it helps to develop their self-confidence and self-image. Cox 51–53; Fannin 55–58.[51]

Defendants will be ordered to submit to the Court a plan to remedy each of the deficiencies in its recreation program which have been detailed here. The plan must include specific steps (1) to increase the amount of recreation time available to all OTS students, particularly to the students in Phase I and Phase II; (2) to establish a physical education program which satisfies all state standards and regulations; and (3) to implement a leisure-time program which will provide OTS students with opportunities to develop skills in arts, crafts and music.

### F. *Parole*

 The evidence demonstrated that defendant, Sproat, refuses to parole or release a student from OTS without the prior approval of the committing court. Pretrial Order ¶ G(36) at 21. Thus, a student could, if his committing court so determined, remain at OTS indefinitely, even though the training school had concluded that the student was completely rehabilitated and ready to return to society.[52]

---

**50.** Approximately 40% of the students are in Phase I. Pretrial Order ¶ G(42) at 23.

**51.** Both Louisiana and South Carolina have state certified physical education programs in their juvenile institutions. Phelps 49; DeCell 10.

**52.** For example, one student was approved for parole on February 8, 1975, but because the committing court refused to give permission, he was not released until November 8, 1975. Pretrial Order Exh. I. During the eight-month period from January 1, through August 31, 1975, 24 students were detained from one to

Defendant's practice is not required by state law, which vests the Superintendent of OTS with complete discretion to parole a student "at any time he may deem it to be in the best interest and welfare of said child." Miss. Code Ann. § 43–21–19 (1972). The experts testified that the decision to release a student from confinement should be made only by the treatment staff, who are the only persons who can accurately determine whether a student has made sufficient progress to warrant parole. Cox 64–65; Milan 91; DeCell 82.[53] Furthermore, Superintendent Sproat recognized that students may regress if their parole is delayed because of the courts' refusal to permit their release. Sproat I at 182–183.[54]

In *Jackson v. Indiana, supra,* the Supreme Court held that a mental retardate could not be incarcerated in a mental institution beyond the time necessary to determine whether he was competent to stand trial, which was the sole basis for which he had been committed. 406 U.S. at 738, 92 S.Ct. 1845. Similarly, in *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), the Court held that a person committed for examination under the state's defective-delinquency statute could not be held beyond a reasonable period necessary for observation. 407 U.S. at 250, 92 S.Ct. 2083. In both cases, the Court reasoned that confinement in an institution must cease when the purpose of the confinement no longer exists.

As previously discussed, under both the United States Constitution and Mississippi Law, the only purposes for which juveniles may be committed to OTS is their treatment and rehabilitation. Defendant Sproat's practice of holding students until the committing court has approved their release is inconsistent with and unnecessary to these rehabilitative purposes. His practice therefore violates the students' rights to due process of law,[55] and the Court will enter an order enjoining the practice.

## VI. MEDICAL AND DENTAL CARE

■ It is well settled that when a state confines a person in an institution, it assumes an obligation for the safekeeping of that individual, including the provision of adequate medical services. Thus, the denial of minimally adequate medical services to adult prisoners has been held to violate the Eighth Amendment's ban against cruel and unusual punishment, *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 202–204 (8th Cir. 1974); *Gates v. Collier, supra* at 1301–1303; *Newman v. Alabama,* 349 F.Supp. 278 (M.D.Ala.1972), *aff'd in perti-*

---

three months after they were approved for parole because of the refusal of the committing court to approve the OTS decision. Exh. P–49.

**53.** The experts testified:

The only person who should have the authority to parole a student from the Oakley Training School is the Superintendent . . based on information, documentation, presented to him by the personnel working with that child . . . . A resident stays at the Oakley Training School for a time beyond which is reasonable for people in his [prior] environment to understand what's been happening to him, and therefore, they cannot be involved [in determining] the habilitation or progress [made] . . . in terms of benefits and readiness to conform perhaps in a more acceptable way to [that] environment. Cox 64–65.

The training school which is working with the youths and has monitored the student's progress and provided the services, is the agency qualified to determine when the youth is ready for release. Milan 91.

**54.** Dr. Cox also described the negative effects of the OTS procedure:

[I]t is extremely damaging to the child when we at the training school have told him and spent many many hours preparing him to go home only to tell him that his home youth court judge or counselor says that he cannot come home, he gets very upset and the whole treatment process stops and sometimes he runs away and sometimes he hurts himself or becomes belligerent and hurts others and we have all kinds of problems with this. Cox 65.

**55.** Defendants' practice of refusing to release students for vacations without permission of the committing court, Pretrial Order ¶ L(9) at 40, is likewise harmful to the students, Sproat I at 174–176, and violates their constitutional right to treatment.

*nent part,* 503 F.2d 1320 (5th Cir. 1974), *mod. en banc with respect to one impertinent issue,* 522 F.2d 71 (5th Cir.), *cert. denied,* 421 U.S. 948, 95 S.Ct. 16, 80, 44 L.Ed.2d 102 (1975), and the denial of medical services to persons not committed under a criminal statute has been found to violate both the Eighth Amendment, *Finney v. Arkansas Board of Correction, supra* at 202; *New York State Association for Retarded Children v. Rockefeller, supra* at 765, 768–769; and the right to habilitation embodied in the due process clause of the Fourteenth Amendment. *Inmates of Boys' Training School v. Affleck, supra; Wyatt v. Stickney, supra. See also, Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Williams v. Edwards, supra.*

■ The evidence in this case demonstrates that OTS does not have sufficient medical personnel or facilities to provide the minimal level of care required by the Constitution. Thus, according to one of the Court's experts who is a juvenile corrections administrator, "[t]he medical facility was inadequate, and that would be the kindest thing that you could say about it." Phelps 19. OTS does not have an overnight infirmary to house students who need to be isolated from the general student population for medical reasons. Pretrial Order ¶ I(5) at 29. Sick students are either returned to their cottages, Williams 14–15; Phelps 20, or placed in isolation cells at the ITU. Pretrial Order ¶ I(5) at 29. There are no around-the-clock, on-duty medical personnel. The medical staff at OTS consists of one registered nurse who is on duty

from 8:00 a. m. to 4:30 p. m., Monday through Friday, Pretrial Order ¶ I(4) at 29, and who sees students who have medical complaints, sometimes seeing as many as 90 in one day. Williams 69. A general practitioner is available to the school on a part-time basis. Pretrial Order ¶ I(4) at 29.

The experts agreed that students committed to a juvenile institution must receive a full physical examination upon admission, including appropriate screening for eyesight and hearing problems, in order to insure that they are physically able to benefit from the educational and other programs offered.[56] Cox 12, 15–16; Draper 23; Milan 17–18; Fannin 21, 23. However, because of the lack of a medical staff and facilities at OTS, students do not receive a physical examination when they arrive at the school,[57] Pretrial Order ¶ I(2) at 28, and are not screened to determine whether they may have any communicable diseases or to determine their immunization status. Likewise, OTS has no inoculation program for students who are in need of routine inoculations. Pretrial Order ¶ I(3) at 28–29.

Although nearly every student at OTS needs some kind of dental work, the school does not have a dental program to meet this need. Pretrial Order ¶ I(6) at 29. Dental services are provided off-campus by a dentist retained for two hours each week, during which period no more than eight students per week may be seen. As a result, students may be seen only for extractions and other emergency-type care, and some students have been on the waiting list for a

**56.** Both the Louisiana and South Carolina juvenile corrections systems offer extensive medical services to their students. In Louisiana, all but one of the state juvenile institutions has its own infirmary, with 24-hour nursing services. (The one institution without an infirmary is located next door to a hospital which provides all necessary care.) All students receive a complete physical examination when they are committed. Phelps 46–47. In South Carolina, there is a central infirmary which serves each of the juvenile institutions in Columbia. The infirmary is staffed by nurses and medical aids on a 24-hour-a-day basis. DeCell 57–58. Students in South Carolina also receive a full physical and dental examination from the department's physician, with appropriate refer-

rals to specialists where indicated, at the state's reception and evaluation center. DeCell 45–46, 51–55. The experts from Louisiana and South Carolina both stated that the medical services at OTS are inadequate and must be improved. Phelps 19–20; DeCell 16–17. Prisoners at the Mississippi State Penitentiary also receive a full medical evaluation before they are placed in the general population. Reed 33.

**57.** At least 40% of the students committed to OTS have not had a recent physical examination and none of the students arrive with a dental report. Pretrial Order ¶ I(1) at 28; Sproat I at 18.

dental appointment for four to five months. Pretrial Order ¶ I(7) at 29. No students have been sent to have their teeth cleaned during the past year, and none receive any form of preventive dental care. Pretrial Order ¶ I(6–8) at 29–30.

The medical program at OTS does not reach the minimal standards required by the Constitution. The defendants will be ordered to present to the Court a written plan, including a specific timetable, for bringing the OTS medical program up to minimum standards. This plan must include a specific provision to establish an overnight infirmary; a sufficient medical staff to allow at least one registered nurse or licensed practical nurse to be on duty at OTS on a 24-hour basis; a complete physical and dental examination of all students who are presently confined at OTS and all future students when admitted; all students who are in need of medical or dental diagnosis or treatment shall receive it, including nonemergency dental care, within a reasonable time after the need for care becomes known to the school; and an appropriate inoculation program for students.

## VII. ACCESS TO LEGAL ASSISTANCE

In *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the Supreme Court held invalid in the absence of a reasonable alternative program of legal assistance, a state prison regulation which prohibited prisoners from providing legal assistance to other prisoners, because the regulation made it effectively impossible for illiterate and poorly educated prisoners to pursue their post-conviction remedies. The Court stated: "[I]t is fundamental that access of prisoners to the courts for the purpose of presenting their complaints may not be denied or obstructed." 393 U.S. at 485, 89 S.Ct. at 749. *Accord, Wolff v. McDonnell, supra; Procunier v. Martinez,* 416 U.S. 396, 419–22, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

Subsequent cases have made it clear that *Johnson* places a greater duty on a state than mere non-interference with prisoners' access to the courts; that is, affirmative action is required to enable prisoners to place their grievances before the judicial system. Thus, in *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), the Court affirmed a three-judge court judgment which required state officials to provide indigent inmates with access to a reasonable law library for preparation of legal actions. The three-judge court had noted that access to the courts, as required by *Johnson,*

> encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him. . . . *Johnson v. Avery* . . . makes it clear that some provision must be made to ensure the prisoners have the assistance necessary to file petitions and complaints which will in fact be fully considered by the courts.

*Gilmore v. Lynch*, 319 F.Supp. 105, 110 (N.D.Cal.1970).[58]

*Gilmore* was recently quoted with approval by the Court of Appeals for this Circuit in *Cruz v. Hauck*, 515 F.2d 322, 331 (5th Cir. 1975), which held that where access to a law library is limited the burden is on jail authorities to demonstrate that "all inmates of the jail have adequate access to the courts through means other than by access to legal materials." 515 F.2d at 332. In *Stevenson v. Reed, supra,* the court held that even the provision of legal materials is not sufficient for poorly educated prisoners who must also be provided with assistance in dealing with the courts:

> *Johnson* thus introduced a requirement of *reasonably adequate* access and placed on the state an affirmative obligation to provide ignorant prisoners with the means of

---

58. Affirmative assistance to insure inmate access to the courts applies to inmate claims under 42 U.S.C. § 1983, such as claims involving the conditions of their confinement, as well as to petitions for post-conviction relief. *Wolff v. McDonnell, supra*, 418 U.S. at 579–80, 94 S.Ct. 2963; *Nolan v. Scafati*, 430 F.2d 548 (1st Cir. 1970); *Stevenson v. Reed*, 391 F.Supp. 1375, 1380 (N.D.Miss.1975), *aff'd*, 530 F.2d 1207 (5th Cir. 1976).

intelligible communication to the judiciary to insure a fair hearing for their claims. The post-*Johnson* cases have uniformly recognized that irremediable ignorance forms a barrier to effective presentation of inmate legal claims quite as real as did the more blatant physical impediments of the past . . .

We therefore conclude that the right of court access requires that the State provide *some source* of assistance for literate and illiterate inmates alike, tailored to their differing needs and abilities . . . . .

391 F.Supp. at 1380–81 (emphasis in original). Thus, the *Stevenson* Court ordered prison authorities to formulate a plan to insure that all prisoners would have adequate access to jailhouse lawyers as well at to the prison law library. 391 F.Supp. at 1383.

■ Juveniles committed to state training schools such as OTS, no less than adult offenders, are entitled to reasonable access to the courts. Under *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and its progeny juveniles are entitled to certain constitutional safeguards in the commitment process. However, the undisputed facts in this case are that a large number of students have been committed to OTS without being represented by counsel. Pretrial Order ¶ O(1) at 42. This Court has previously entered a judgment declaring that a Youth Court in this state must provide counsel for indigent juveniles and must require that allegations in juvenile cases be proved beyond a reasonable doubt. *McLemore v. Cubley*, C.A. No. J75–159(N) (S.D. Miss.1975).[59]

In adult prisons, the provision of a law library in conjunction with the assistance of jailhouse writ writers, "usually a few old hands or exceptionally gifted prisoners," *Johnson v. Avery, supra*, 393 U.S. at 488, 89 S.Ct. at 750, is generally viewed as capable of providing a means of intelligible communication to the courts. However, there is no law library at OTS, Pretrial Order ¶ O(3) at 42, and even if there were, without assistance the students could not make effective use of legal materials.[60] Furthermore, the students' ages, their lack of experience with the criminal system, and their relatively short confinement means that there cannot be a system of writ writers for students who need them.[61] The evidence in this cause also establishes that the rehabilitation of a juvenile at OTS is seriously interfered with if he believes that his legal rights have been violated. Cox 13–14.[62]

■ At the present time, Community Legal Services, Inc., a legal services program for the poor operating in Hinds County, is providing, without any interference from the Oakley administration, free legal service to those indigent students at OTS who contact Community Legal Services requesting such assistance, Pretrial Order ¶ O(5) at 43, and has offered to provide limited on-site legal services. Pretrial Order Exh. Q. The mail regulations that are in effect provide for privileged mail be-

---

**59.** In *McLemore*, this Court ordered defendant Sproat to give notice to all OTS students committed from Forrest County that their commitments might be invalid, and that legal assistance was available from Community Legal Services, Inc. and Mississippi Bar Legal Services, Inc. As a result of this notice, eight students were released from OTS through state post-commitment proceedings. Pretrial Order ¶ O(2) at 42.

**60.** Sixty-five percent of the students at OTS are of subnormal intellectual capacity and ninety percent of the students are in need of some special education assistance. Cox 10.

**61.** There are presently no student writ writers at OTS. Pretrial Order ¶ O(3) at 42.

**62.** The Superintendent of OTS has testified in another proceeding in this Court:

Q. Now, in your experience, Mr. Sproat, in attempting to rehabilitate Juveniles after they have been adjudicated delinquent, is it your opinion, have you found that it is important [to] that rehabilitative process for the Juvenile to feel that he has been fairly treated within the Juvenile system?

A. Very much so.

Q. And this would include the way he was treated in the Court, whether he felt like he got due process and his rights were complied with?

A. Yes.

Exh. P–55 at 5.

tween a student and his attorney or other court officials. Further, in their Proposed Findings and Conclusions submitted to the Court, the defendants have offered to do the following:

1. To notify all students presently at Oakley Training School and each incoming student, upon admission, in writing and orally, that if the student desires to obtain legal assistance with respect to [his] commitment to Oakley Training School, [he] may contact: (a) Community Legal Services of Mississippi, Inc., P.O. Box 22571, Jackson, Mississippi 39205, (b) Mississippi Bar Legal Services, 405 Tombigbee Street, Jackson, Mississippi and/or (c) the student's personal attorney.[63]

2. The written contact will be forwarded immediately to the proper legal assistance group or attorney.

3. The written contact will be handled in accordance with Section 3 (Privileged Mail) of the policies regarding mail at Oakley Training School. This contact is to be made in writing and signed by the student, student's parents, or the student's legal guardian.

Defendants' Proposed Findings of Fact and Conclusions of Law, at 13–14.

The Court finds that the legal services presently available to students at OTS, when supplemented by those suggested by the defendants in their Proposed Findings and Conclusions, form the basis for compliance with the constitutional mandate of *Johnson v. Avery* and its progeny. The Court will therefore order the defendants to implement the aforementioned procedures which they have proposed, without reducing in any way the legal service presently available at OTS. In addition to the notice contemplated by Paragraph 1 of these procedures, defendants shall submit for the Court's approval a summary of legal services available to Oakley students, copies of which, upon the Court's approval, shall be posted in conspicuous places in each student residence, the administration, academic and

vocational buildings, and the recreation hall. Defendants will be further ordered (1) to forward immediately to the appropriate lawyer or legal services program any written request for legal assistance made by any OTS student, (2) to inform those making oral requests for legal assistance that such requests must be in writing, and (3) if necessary, to assist those making oral requests in making such requests in writing.

Defendants will also be ordered to ascertain from each student committed to OTS whether the student was represented by an attorney in his commitment proceedings and advise any student who was not so represented that his commitment may be invalid. Although the Court will not order the defendants to accept the offer of Community Legal Services, Inc. to provide limited on-site legal services, Pretrial Order Exh. Q, the Court does not hereby preclude the defendants from accepting such services, if available, from Community Legal Services or any other such proper and competent service.

## VIII. CONCLUSION

The conditions at Oakley Training School violate plaintiffs' rights guaranteed by the United States Constitution. It is this Court's duty to redress these deprivations, and we have set forth in this opinion the minimum actions which are necessary for this purpose. The Court wishes to make clear that it is not questioning the integrity or commitment of the defendants, who have been hampered by the lack of resources allocated by the State for the care and treatment of its juvenile offenders. These difficulties, however, cannot excuse the unconstitutional conditions which exist at OTS; nor can they stand in the way of the full relief to which plaintiffs are entitled. *Detainees of Brooklyn House of Dentention for Men v. Malcolm*, 520 F.2d 392, 399 (2d Cir. 1975); *Wyatt v. Aderholt, supra*, 503 F.2d at 1314–1315 (5th Cir. 1974); *Gates v.*

---

**63.** In the event that other qualified legal services programs for the poor now or in the future operate in Hinds County and agree to provide

legal assistance to OTS students, the names and addresses of these programs shall be added to this list.

*Collier, supra,* at 1319–1320 (5th Cir. 1974); *Brenneman v. Madigan,* 343 F.Supp. 128, 139 (N.D.Cal. 1972); *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971).

An Order conforming with the foregoing Memorandum Opinion, approved as to form by attorneys for both sides, shall be submitted within the time provided by the Local Rules.